

**KOCH**
**ENTERTAINMENT**

**AGREEMENT** entered into as of December 1, 2008 by and between **KOCH Entertainment, LP,** 22 Harbor Park Drive, Port Washington, NY 11050 ("We", "Us"), and **Time For Three, LLC** ("you", "your") for the exclusive recording artist services of Zachary De Pue, Ranaan Meyer, and Nicolas Kendall p/k/a **"Time For Three"** (the "Artist"), c/o Bernard M. Resnick, Esq., P. C., Two Bala Plaza, #300, Bala Cynwyd, Pennsylvania 19004.

The parties agree as follows:

## 1. PRODUCT:

(a)    You agree to Deliver to us one (1) newly recorded, previously unreleased and fully cleared "live" album embodying the performances of the Artist, embodying no less than twelve (12) newly recorded, previously unreleased studio master recordings with a minimum total playing time of forty-five (45) minutes (the "Album")-title to be determined, no later than ninety (90) days from full signature of this Agreement.

(b)    Simultaneously with your Delivery of the Album hereunder, you also agree to Deliver to us any and all other materials (including, but not limited to, any DVD, any video footage, music videos, EPKs, etc.) ("Other Materials") created in connection with the Album hereunder (if any).

(c)    We will have the right to release any Other Materials Delivered hereunder separate and apart from the Album hereunder.

## 2. EXPLOITATION PERIOD:

The exclusive exploitation period for the Album (and the Masters as defined below) and Other Material will commence upon the date hereof and will expire the later of (i) ten (10) years from our initial USA release of the Album delivered hereunder or (ii) two (2) years after recoupment (the "Exploitation Period"). At the end of the Exploitation Period, all rights for the Album and Other Material throughout the Territory granted to us pursuant to this Agreement will terminate and will revert to you, except that we will have a six (6) month non-exclusive sell-off period following the expiration of the Exploitation Period (the "Sell-Off Period"). We agree to not manufacture or authorize the manufacture of records during the Sell-Off Period.

## 3. TERRITORY:

The territory of this Agreement will be the Universe (the "Territory").

## 3A. RELEASE COMMITMENT:

(a)    We will release the Album in the US within one hundred eighty (180) days after Delivery (as defined below) of the Album to us, excluding December and January.  If we fail to make the release within the required time, you may give us notice within sixty (60) days after the end of the required time indicating that unless we release the Album in the United States within forty-five (45) days from our receipt of the notice, you will terminate this Agreement. Your sole remedy will be to terminate the Agreement if we do not make such release in accordance with that notice. Upon termination, all rights granted to us in that Album hereunder will immediately revert back to you, and we will have no further rights to the Masters for the Album.

(b)    Upon your written notification to us of the Artist's touring schedule in the territories of Chile, Japan, France, Germany and the United Kingdom (individually and collectively the "Key Territory"), with such written notification to be delivered to us at least one hundred twenty (120) days prior to the Artist's commencement of such tour in the applicable Key Territory, we agree to release the Album in the applicable Key Territory within sixty (60) days prior to Artist's appearance in the Key Territory (individually and collectively, the "Int'l Release Period"). If we fail to make the release within the Int'l Release Period, you

may give us notice within forty five (45) days after the end of the Int'l Release Period indicating that unless we release the applicable Album in the specific Key Territory within thirty (30) days from our receipt of the notice, the rights in and to the Album in the specific Key Territory in which the Album was not released within the Int'l Release Period shall revert to you.

**4.   ADVANCE:**   Contingent upon full signature of this Agreement, we will pay the following non-refundable general advance to you to be recouped from royalties (other than Mechanical Royalties) hereunder: Fifteen Thousand ($15,000.00) Dollars, payable as follows: (i) thirty percent (30%) upon full execution of this Agreement; (ii) forty percent (40%) upon your delivery and our acceptance of twelve (12) rough Masters with a total minimum playing time of forty-five (45) minutes; and (iii) the balance upon the later of (A) full and complete Delivery of the Album and Other Materials, or (B) the initial US commercial release of the Album, less any costs that we incur to complete the Album.

**4A. SALES BONUS:**   We will pay you a Five Thousand ($5,000.00) Dollar recoupable sales bonus upon the Album achieving rack, chain and indie Soundscan sales units of 10,000 within twelve (12) months of release. Solely for the purposes of calculating the sales thresholds hereunder, every ten paid individual downloads (sold on a "retail basis" and determined on a per-song basis) will be considered one sales unit.

**5.   RIGHTS:**

(a)   For the Territory during the Exploitation Period, we will have the exclusive rights to the Album (and the masters embodied therein and derivatives thereof, including, without limitation, a capella versions, instrumental versions, deluxe versions, greatest hits, videos and remixes, collectively the "Masters") and Other Material for all purposes in any and all media now known or hereafter developed, including but not limited to, all forms of DEMD and all ancillary rights. For the purposes of this Agreement, "DEMD" will mean any transmission, distribution, dissemination or making available of recordings (or the digitised content thereof) by any means now or hereafter known including, but not limited to, distribution via telephone (including, without limitation, ring tones, ring backs, realtones, push ringers, pictones, voicetones and text messages), satellite, broadcast, wireless, cable and/or the internet (by any method or means), whether or not a direct or indirect charge is made. You also grant us the right to use your names, trademarks, trade names, logos, approved likenesses and approved biographies in connection with the exploitation of the Album and Other Material hereunder.

(b)   For the Territory during the Exploitation Period, we and our licensees shall have the right, without any liability to any person, to use and to authorize other persons to use the names (including, without limitation, all professional, group and other assumed or fictitious names or sobriquets), likenesses and biographical material of or relating to you and/or the Artist, and the names (including all professional, group and other assumed or fictitious names or sobriquets), likenesses and biographical material of or relating to any producer and any other party performing services in connection with the Masters, on and in connection with the exploitation of recordings and Other Material hereunder, on Internet websites and for purposes of advertising, promotion and trade and in connection with the marketing and exploitation of records and Other Material hereunder and our general goodwill advertising (advertising designed to create goodwill and prestige and not for the purpose of selling any specific product or service), without payment of additional compensation to you, the Artist or any other person.   You warrant and represent that the use of such names, likenesses, and biographical materials as described above in this subparagraph 5(b) shall not infringe upon the rights of any person.   If any person challenges the Artist's right to use a professional name, We may, at our election and without limiting any of our other rights and remedies, require you to cause the Artist to adopt another professional name to be selected by you and approved by us in our reasonable discretion without awaiting the determination of the validity of such challenge.   Furthermore, during the Term, the Artist shall not change the name by which the Artist is professionally known without our prior written approval.

(c) Artist may maintain and host one (1) independent Internet website ("Independent Site") located at a URL selected by you and Artist, for the sole purposes of: (i) selling the Artist's commercial merchandise other than merchandise using or incorporating any of our materials on the Independent Site; (ii) exploiting Artist's activities as a songwriter; and (iii) describing Artist touring activities; provided, however that: (w) the Independent Site shall not be operated or hosted in conjunction with, affiliated with, or licensed to, a network of websites; (x) neither you, the Artist, nor any person deriving rights from you or the Artist shall have the right to use on and/or in connection with the Independent Site any recordings or any musical, dramatic, artistic and literary materials, ideas, and other intellectual properties owned and/or controlled by us or any of our licensees, in whole or in part, directly or indirectly, including for the avoidance of doubt and without limitation, any Masters, artwork owned or controlled by us and/or other recordings; and (y) the Independent Site shall include on its homepage prominent links to our Internet websites (including the Artist Site designated by us) with the visual elements and placement of such links to be approved by us.

(d) Intentionally deleted.

(e) We will also have the exclusive right to use the Album artwork and Other Material in respect of merchandising solely in connection with the creation of "skins" for electronic devices pursuant to our agreement with Music Skins, LLC.

**6. EXCLUSIVE TERM:** This Agreement will be exclusive, and you agree to not record and release products (including, without limitation, CDs and DVDs) featuring the Artist's performances via any person or entity, through the period commencing on full signature of this Agreement and ending nine (9) months after initial USA release of the Album delivered under this Agreement ("Term"). In this regard, you hereby warrant and represent that neither you nor Artist have entered into any agreements (prior to the date hereof or otherwise) that provides for the release of any product embodying the Artist's performances during the Term of the Agreement, excluding Artist's prior agreement with Time For Three, LLC.

**7. DELIVERY (the following items collectively referred to herein as "Deliver", "Delivery", "Delivered"):** You will deliver to us (i) digital master tapes for the Masters (including instrumental versions of each Master) technically and commercially satisfactory for the manufacture of audio and/or audio-visual products (as applicable) therefrom; (ii) for each title hereunder, CD or Zip Disks for the packaging artwork, e.g., collected Quark files with all fonts and pictures, or as both outlined and editable text; Illustrator files with all pictures embedded (not linked), and all fonts used in the layout provided as well, or Photoshop layered files with all fonts and with the artwork being in a CMYK, 300dpi, psd layered format; (iii) label copy, liner notes, lyrics and all publishing credits (on disk); (iv) true copies of each mechanical license application for use of each previously released composition embodied in the Masters for "first use" compositions, you will deliver mechanical license applications, along with a valid written confirmation from the applicable music publisher and/or Harry Fox, for our commercial release of that first use composition as embodied in the Masters; (v) true copies of synchronization licenses (if applicable); (vi) cue sheets (if applicable); (vii) true copies of each guest artist's agreement with you and any clearances from each guest artist's applicable label (if guest artist is subject to an exclusive recording artist agreement with another entity), if any; (viii) true copies of each producer agreement, if any; (ix) true copies of each sample license, if any; and (x) any other elements or approvals reasonably requested by us. Any expenses incurred by us in preparing the Masters for manufacture hereunder will be deemed advances against royalties payable to you pursuant to this Agreement. It is specifically agreed that if you fail to deliver artwork and we create such artwork after your failure to so deliver, we will have the right to charge back to your account a $5,000.00 artwork overhead fee.

**8. ROYALTIES:** Royalties to you hereunder will be computed and paid as follows:

(a) On sales of records to consumers (or for resale to consumers), an all-in royalty in the amount of twenty (20%) percent of our published price to dealer ("PPD"), the PPD being our average wholesale price to

the dealer in the country of sale during the relevant accounting period (the "Basic U.S. Rate").  On mid-price records the royalty rate will be two-thirds (⅔) of the Basic U.S. Rate; on budget line records and singles, one-half (½) of the Basic U.S. Rate.

(b)   We agrees to increase the Basic U.S. Rate by one percent (1%) on a prospective basis upon achieving the following indie, rack and chain Soundscan sales units for a top-line release of the Album: 20,000 and 40,000 respectively within twelve (12) months of the initial commercial release of the Album.

(c)   On records for sale or resale outside the USA, the royalty rate payable hereunder will be the following proportions of the applicable rate set forth above and will be based upon the PPD in the applicable country:

|  |  |
|---|---|
| Canada | 85% |
| UK, Germany, Japan, Germany, Italy, and Australia/New Zealand: | 75% |
| ROW | 50% |

Notwithstanding the foregoing, in no event will the royalties payable to you under this paragraph exceed one-half (½) of the royalties we receive from a third party license in the relevant country of sale.  Such royalties will be computed in the national currency of the applicable country of sale and will be credited to your royalty account hereunder at the same rate of exchange and same number of units as we are paid.

(d)   With respect to records sold by us through a television advertising campaign, the royalty rate will be one half (½) of the otherwise applicable royalty rate in the Territory that the campaign is run. With respect to records sold by us through mail order, your royalties will be computed at one-half (½) of the applicable rate set forth above, and will be based upon the PPD for the same or comparable records. With respect to records licensed by us for sale through a record club or by mail order or licensed by us for sale in conjunction with a television advertising campaign, and with respect to our other licenses of the Masters (e.g., synchronization uses, third party compilation licenses), we will credit your royalty account with one quarter (¼) of the royalties received by us or twenty-five (25%) percent of the net amount received by us, as applicable, from such sales and licenses.

(e)   No royalties will be payable on reasonable number of records furnished as free or bonus records or "premiums" to members, applicants or other participants in any record club or mail order plan, on reasonable number of records distributed for promotional purposes to press and media of the Album, on reasonable number of records shipped on a bona-fide no-charge basis or records sold for scrap or as "cut-outs" or at less than fifty (50%) percent of our regular wholesale price (ours or our licensee's, as the case may be), or on a reasonable number of records sold to broadcasting stations, educational institutions and libraries.  Royalties on records sold other than through normal distribution channels including, without limitation, records sold for use as premium merchandise, will be one-half (½) of the applicable rate otherwise set forth above and will be based upon the price received by us for such records.

(f)   The rate of royalty on a package containing more than one (1) Album ("Multiple Album Set") will be a percentage calculated on a "format by format" basis of the applicable Basic U.S. Rate such percentage being the following fraction expressed as a percentage:-

$$\frac{A}{B \ X \ C}$$

where "A" represents the royalty base price of the Multiple Album Set in the country of sale, "B" represents the standard "full price" royalty base price of a record as the case may be in the country of sale at the date of release of the Multiple Album Set and "C" is the number of Albums in the Multiple Album Set.

(g)   Notwithstanding anything to the contrary contained herein, the royalty rate on any record in a new technology configuration (i.e., a configuration other than vinyl disc record, cassette or audio-only compact disc) will be eighty-five (85%) percent of the otherwise applicable royalty rate until Company or the USA record industry generally pays full rates on that configuration, but in no event later than two (2) years after Company releases the Album concerned in that configuration.  Audio-only compact discs are not a New Technology Configuration and will be paid at full rate.

(h)   Notwithstanding subparagraph 8(g) above, with respect to Records sold via DEMD on a "retail basis" (i.e., sales through i-Tunes and similar types of retail-based per download service companies), the royalty rate will be seventy-five percent (75%) of the royalty rate that would otherwise apply if the record concerned was sold through normal retail channels. With respect to records licensed by Company for sale via DEMD (including, without limitation, sales through e-Music and similar types of subscription-based download service companies, and mobile uses (ring tones, ring backs, etc.), Company will credit your royalty account with twenty-five (25%) percent of Company's net royalty receipts in connection thereto, or twenty-five (25%) percent of the net amount received by or credited to Company in connection thereto, as applicable, from such licenses (less any actual costs that we may incur in connection thereto, including, without limitation, mechanical royalty payments and administration costs).

(i)   Notwithstanding any of the foregoing,

(i)     For purposes of computing royalties, any excise, sales or comparable or similar taxes will be excluded from the price upon which the royalties are calculated and all discounts, placement costs and rebates granted will be excluded from that price;

(ii)    For purposes of computing royalties, that portion of the applicable price which is or shall be customarily allocated by us or our licensees to packaging will be twenty-five (25%) percent (zero percent (0%) for sales made via DEMD).

(iii)   Royalties will be computed and paid upon eighty-five (85%) percent of gross Album sales for which payment has been received by or credited to us ("Net Sales") [for the sake of clarity, the calculation of the royalty based on 85% of sales is designed to provide for a "free goods" allowance of 15% of Album sales] and

(iv)    Whenever a Master is coupled on a record with other master recordings, the royalty hereunder will be based upon that portion of the applicable price which the Master bears to the aggregate number of all master recordings embodied on such record (including any Masters).

(j)   The royalties provided for in this Agreement are inclusive of all royalties payable to you, to the Artist, to the producer(s) and to all third parties (other than Mechanical Royalties) for sale of records embodying the Masters and the use of the Masters.  You agree to pay over all amounts due to producer(s) in respect of the Masters and to all other third parties to whom you are obligated to make payments in respect of the Masters, and you agree to fully indemnify us and hold us harmless from and against all claims by any of them for remuneration pertaining to the Masters.

(k)   Net sales of merchandise embodying album artwork or Other Material will be split 50/50 between the parties.

**8A. <u>MARKETING RESTRICTIONS</u>**   We agree that during the Term, we will not release any Album delivered hereunder as a Budget record in less than eighteen (18) months; at Mid-Price in less than twelve (12) months; after initial release of the Album in the United States.  If we release any such Album at Mid-Price or on Budget line prior to the respective twelve (12) month and eighteen (18) month "holdback" periods without your approval, your sole remedy shall be that we shall not reduce your royalty rate pursuant to subparagraph 8(a) above for sales of such Album at Mid Price or Budget line during such period.

## 9. ACCOUNTINGS:

(a)   We will account to you within ninety (90) days following the close of each calendar half-year (i.e., June 30th and December 31st). We will be entitled to maintain a reasonable reserve against anticipated returns, rebates and credits not to exceed twenty-five percent (25%). Each reserve will be liquidated in full within twelve (12) months following the period in which the reserve is created. Notwithstanding the foregoing, from time-to-time during the Exploitation Period the reserve for Albums may be adjusted upward in our good faith business judgment in the event the number of units scanned (USA Soundscan) is disproportional to the number of units shipped in the applicable accounting period. All royalty statements and all other accounts rendered hereunder will be binding and not subject to any objection by you for any reason unless specific objection in writing, stating the basis thereof, is provided to us within two (2) years from the date rendered (the "Objection Period").   Any action, suit or proceeding relating to any royalty statement rendered hereunder must be commenced by you within six (6) months year after expiration of the Objection Period for that statement.  We will be entitled to recoup fifty percent (50%) of any independent radio costs incurred by us (100% in respect of college radio) and one hundred percent (100%) of any independent marketing, publicity and/or press costs incurred by us.

(b)  We will maintain books of account concerning the sale, distribution and exploitation of records made hereunder.  A certified public accountant or attorney on your behalf may, once per year and once per statement and at your sole expense, examine our books and records to verify the accuracy and completeness of our accountings to you.  Such examinations shall be made at our office, during usual business hours and upon thirty (30) days prior written notice. Our books relating to activities during any accounting period may only be examined as aforesaid during the Objection Period.

(c)   We will have the right to deduct from any amounts payable to you hereunder such portion thereof as may be required to be deducted by the United States Internal Revenue Service and/or any other governmental authority or under any other applicable union or guild agreement, and you shall promptly execute and deliver to us such forms and other documents as may be required in connection therewith; we shall use reasonable efforts to provide you with all such documents.

## 10. PUBLISHING ROYALTIES:

(a)  You hereby grant to us an irrevocable license under copyright to reproduce each selection wholly or partly written, or owned or controlled by you, directly or indirectly or wholly or partly written, or owned or controlled by the you, directly or indirectly ("Controlled Compositions") on records derived from the Masters and to distribute such records in the United States and Canada and to reprint the lyrics of Controlled Compositions on the packaging (or insert) thereof throughout the Territory, in consideration for payment of royalties ("Mechanical Royalties"). We will pay Mechanical Royalties on Controlled Compositions on Net Sales of records in the same amount of units as are accounted to for record royalties, hereunder at seventy-five percent (75%) percent of the U.S. minimum statutory rate (pursuant to CMRRA regulations in Canada) in effect as of the date hereof without regard to playing time, subject to the following caps: Albums: 10x; Mini-Albums and EP's: 5x; Singles: 2x. We will not be obligated to pay more than one Mechanical Royalty with respect to a particular composition on a particular record hereunder. Notwithstanding the foregoing, with respect to any EP's, singles, premiums, sales made via DEMD, and Albums sold at mid price or budget, the applicable Mechanical Royalty rate for Controlled Compositions will be at seventy-five (75%) percent of

the otherwise applicable rate. We will have the right to deduct any publishing payment overages from royalties payable to you hereunder.

(b) We agree to increase the applicable rate hereunder to eighty seven and one half (87.5%) percent on a prospective basis upon such top-line Album achieving 20,000 indie, rack and chain Soundscan units, but the mechanical royalty cap as indicated will still apply. We agree to increase the applicable rate hereunder to one hundred (100%) percent on a prospective basis upon such top-line Album achieving 40,000 indie, rack and chain Soundscan units, but the mechanical royalty cap as indicated will still apply.

(c) You grant to us, our licensees and assigns an irrevocable license under copyright to reproduce each Controlled Composition in motion pictures, television programs (and commercials) and other audio-visual works (collectively, "Pictures"), and to distribute and to perform those Pictures throughout the world. We, our licensees and assigns will not be required to make any publishing payment in connection with those uses, and such license will apply whether or not we, our licensees and/or assigns receive any payment in connection with those Pictures. If a Controlled Composition is owned or controlled by a person or entity other than you, in whole or in part, then you will cause such person or entity to grant us the same aforementioned rights (if the copyright interest in a Controlled Composition is transferred, in whole or in part, then any such transfer will be made subject to the terms of this Agreement).

(d) For commercial audio-visual use, we will pay you a Mechanical Royalty (i.e., a synchronization royalty) of eight cents ($.08) per Controlled Composition, subject to an overall cap of $1.00 per title. You hereby acknowledge, understand and agree that you will be solely and completely responsible for securing any and all audio-visual format music publishing rights and clearances necessary to effectuate the terms of hereof. We will remit payment of the applicable music publishing fees to the applicable parties when and as due. You grant us a gratis license for the use of Controlled Compositions in connection with both audio and audio-visual promotional uses.

11. **RIGHT OF FIRST REFUSAL:** If you at any time during the Exploitation Period propose to enter an agreement for the sale of your rights in the Masters in the Territory, then you agree to first negotiate in good faith with us. If we are unable to reach an agreement within thirty (30) days then you are free to negotiate with third parties.

12. **RE-RECORDING RESTRICTION:** You will not record, produce or perform in connection with the production of any record embodying any musical composition embodied in a Master hereunder before the later of the following dates: (A) five (5) years after the date upon which the applicable Master(s) were delivered to and accepted by us, or (B) two (2) years after the expiration of the Term

13. **WARRANTIES AND REPRESENTATIONS/INDEMNIFICATION:** You warrant and represent that you own and control all rights necessary to grant the rights set forth herein, and agree to fully indemnify us in regard to any third party claims that may arise in connection thereto that is reduced to a final, non-appealable judgment or settled with consent (we can settle for up to $10,000.00 without your consent), including, without limitation, any attorneys fees or costs that we may incur in regard to defending against any such claim or action. You will cause Artist to execute and deliver to us at the time of execution of this Agreement our standard Artist Inducement Agreement annexed hereto as Exhibit "A".

14. **NOTICES:** All notices from or to the parties hereto will be in writing and will be sent by personal delivery, national courier or by registered or certified mail, return receipt requested. Notices will be deemed to be given when received, and will be sent to the recipient's respective address as set forth above. A copy of notices from us to you pertaining to this Agreement will be sent to Bernard M. Resnick, Esq., P. C., Two Bala Plaza, #300, Bala Cynwyd, Pennsylvania 19004, Attn: Bernard M. Resnick, Esq., provided that failure to send a copy of such notices shall not be deemed a material breach of this Agreement. Copies of notices from you to us pertaining to this Agreement will be sent to each of our President and our Senior Vice

President, Business & Legal Affairs, respectively, at the following address: KOCH Entertainment LP, 740 Broadway, 7th Floor, New York, NY 10003.

**15. APPROVALS:**  Whenever your approval is required hereunder, it will not be unreasonably withheld or delayed, unless otherwise specified herein.  When your approval is required you must send written notice of approval or detailed disapproval within five (5) days after you receive our request for the approval.  Failure to give due notice of approval or disapproval will be deemed to be approval.

**16. PROMOTIONAL OBLIGATIONS:**  Subject to Artist's prior professional commitments, you agree to make Artist available from time-to-time to appear for photographs, posters, and cover art, and the like, under the direction of our staff, and to appear for interviews with representatives of the communications media and our publicity personnel. Any reasonable expenses incurred under this paragraph approved by us in writing in advance will be borne by us as a non-recoupable expense, unless otherwise agreed.

**17. ARTIST SALES:**  We will sell you CD copies of the Albums at our standard artist rate of six ($6.00) dollars per unit and Artist may sell such Albums solely at Artist's live shows. Artist Sales shall be non-royalty bearing. For the avoidance of doubt, neither artist royalties nor mechanical royalties will be payable on Artist Sales.

**18. APPLICABLE LAW/EXCLUSIVE JURISDICTION:**  This Agreement is made in the State of New York and its validity, construction and performance will be governed by the laws of the State of New York applicable to agreements made and to be entirely performed in New York, without regard to any conflicts of laws principles. The Federal and State Courts in New York County will have exclusive jurisdiction of any dispute arising under or concerning this Agreement (including, without limitation, in respect of the Album(s) and the Masters).  Service of process pursuant to this paragraph may be made, among other methods, by delivering the same via overnight mail or mailing by certified air mail, return receipt requested, in the same manner as giving other notices under this Agreement, and will be effective upon sending the process.  Such service is deemed to have the same force and effect as personal service within the State of New York.

**19. MISCELLANEOUS:**

(a)    The relationship between you and us hereunder will at all times be that of independent contractors; and nothing contained herein will render or constitute the parties joint venturers, partners, agents or fiduciaries of each other.  Neither you nor we will hold itself out to third parties other than as set forth herein.  Neither you nor us will have the right to execute any contract on behalf of the other (except as specifically provided for herein), or incur any obligation for which the other may be liable, or otherwise bind the other (except as specifically provided for herein); and, except as set forth herein, neither you nor us will be liable for any representation, warranty, covenant, agreement, act or omission of the other under this Agreement.

(b)    It is expressly acknowledged and agreed that the Masters are of a special, unique and intellectual character which gives them peculiar value, and that in the event of your breach or threatened breach of any term, condition or covenant hereof we will be caused immediate, irreparable injury and we will be entitled to seek injunctive and other equitable relief, in addition to any other rights or remedies, for damages or otherwise, available to us. In no event will a party hereto be deemed to be in default or breach of this Agreement unless and until that party will first have received written notice from the other party describing the exact default or breach claimed, and then only if the recipient of the notice fails to cure said default of breach within thirty (30) days from receipt of the notice. Notwithstanding the foregoing, if you claim that additional monies are payable to you hereunder, we will not be deemed in material breach of this Agreement unless such claim is reduced to a final judgment by a court of competent jurisdiction, and we fail to pay you the amount thereof within thirty days after we receive notice of the entry of such judgment.

(c)   This Agreement sets forth the entire agreement between you and us with respect to the subject matter hereof.  This Agreement will not become effective until it is executed by all parties. No modification, amendment, waiver, termination or discharge of this Agreement or any provision hereof will be binding upon either party hereto unless confirmed by a written instrument signed by a duly authorized officer of you and us.  A waiver by either party hereto of any term or condition of this Agreement in any instance will not be deemed or construed as a waiver of such term or condition for the future. Wherever possible, each provision hereof will be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein will, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision will be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of that provision or any other provisions of this Agreement, unless such construction would be unreasonable.

(d)   This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same.  The captions used in this Agreement are for convenience only, and are not inclusive or exclusive of all matters relating to the captions.

(e)   This Agreement constitutes the basic terms of our agreement with you and serves to memorialize it and may not be modified or terminated except by a signed written document.

**(f)   This Agreement has binding legal effect, and grants certain exclusive rights to us.  You acknowledge that you have consulted with and are represented by an attorney who is knowledgeable about the subject matter of this Agreement and the record, music and entertainment industries, and that you have been advised about the content and effect of the provisions of this Agreement.**

ACCEPTED AND AGREED TO:

KOCH ENTERTAINMENT LP
By Koch Entertainment GP LLC (its General Partner)

By: _____
        Robert Frank, President

**TIME FOR THREE, LLC**

By: _____
        an authorized signatory
Name: _Zachary R Pre_____
Its: _CFO_____
EIN# _26-2697270_____

EXHIBIT "A"

**ARTIST INDUCEMENT AGREEMENT AND GUARANTEE**

In order to induce you to enter into this Agreement, we agree and hereby acknowledge that (a) we have read all of the terms and conditions set forth in this Agreement, and (b) we shall be bound by such terms and conditions, including but not limited to all warranties set forth in the Agreement, and shall render our services in accordance therewith as if we were a party thereto.

_____
Zachary De Pue

_____
Ranaan Meyer

_____
Nicolas Kendall